1  Eric H. Gibbs (SBN 178658)
2  Andre M. Mura (SBN 298541)
   Scott M. Grzenczyk (SBN 279309)
3  Steve Lopez (SBN 300540)
   **GIRARD GIBBS LLP**
4  One Kaiser Plaza, Suite 1125
   Oakland, California 94612
5  Telephone:     (510) 350-9700
6  Facsimile:     (510) 350-9701
   ehg@girardgibbs.com
7  amm@girardgibbs.com
   smg@girardgibbs.com
8  sal@girardgibbs.com
9
   Elizabeth C. Pritzker (SBN 146267)
10 Jonathan K. Levine (SBN 220289)
   Shiho Yamamoto (SBN 254741)
11 **PRITZKER LEVINE LLP**
12 180 Grand Avenue, Suite 1390
   Oakland, California 94612
13 Telephone:     (415) 692-0772
   Facsimile:     (415) 366-6110
14 ecp@pritzkerlevine.com
15 jkl@pritzkerlevine.com
   sy@pritzkerlevine.com
16
   *Attorneys for Plaintiffs*
17

18            **UNITED STATES DISTRICT COURT**
19          **NORTHERN DISTRICT OF CALIFORNIA**

20 WARREN LAU and ELAINE HERMAN,          Case No. _____
   on behalf of themselves and all others
21 similarly situated,                    **CLASS ACTION COMPLAINT**
22
                    Plaintiffs,            **DEMAND FOR JURY TRIAL**
23        v.
24
   VOLKSWAGEN GROUP OF AMERICA,
25 INC. and VOLKSWAGEN AG,
26
                    Defendants.
27
28

## NATURE OF THE CASE

1. In recent decades, fewer diesel engine vehicles have appeared on U.S. roadways. Even though diesel engines can usually provide more torque than gas engines, they are also higher polluters and more expensive. Diesel passenger cars thus began to disappear in the 1980s and 1990s, and were all but eliminated in 2004, when the California Air Resources Board (CARB) implemented rigorous emission standards that effectively banned their use. Finally, in the late 2000s, Volkswagen introduced a supposedly new breed of diesel vehicles that could meet CARB's emission standards. Volkswagen told consumers they could finally have it all—power, fuel economy, and low emissions—if only they were willing to pay a few thousand dollars more for these "clean diesel" vehicles.

2. But Volkswagen's diesel vehicles were anything but "clean." Rather than devoting its time to actually designing and manufacturing a cleaner engine, Volkwagen had focused on finding a way to cheat. The new "clean diesel" vehicles remained incapable of passing federal and state emissions standards, but Volkswagen had equipped the vehicles with illegal software designed to falsify the vehicles' emissions. The software automatically detects when a vehicle is undergoing emissions testing and activates the full emissions control system. Then, as soon as the test is over, the software switches the vehicles back into "road calibration," eliminating some pollution controls. In other words, when the vehicles are actually driven (as opposed to being tested), they emit ten to forty times the lawful amount of nitrogen oxide—a pollutant that contributes to smog and serious health problems.

3. Without its illegal software, Volkswagen would not have been able to sell a single "clean diesel" vehicle in the United States. But Volkswagen's scheme worked for years, allowing it to place a half million of these vehicles on America's roads. Only recently, after a university study called the emissions levels into question, and the EPA and CARB began to investigate, was the validity of the test results called into question. Even then, Volkswagen continued to lie. It told the government that the university study results were anomalous and fixable. A few weeks ago, Volkswagen was finally compelled to admit what it had done.

4. Volkswagen's conduct violates federal law, California's consumer protection statutes and common law, and is a breach of applicable warranties. Plaintiffs bring this suit on behalf of

1

CLASS ACTION COMPLAINT

themselves and proposed nationwide and California classes to obtain damages (both actual and punitive), restitution, and to enjoin Volkswagen from continuing to deceive consumers.

## PARTIES

5.     Plaintiff Warren Lau is a citizen and resident of Santa Clara, California, located in Santa Clara County.

6.     Plaintiff Elaine Herman is a citizen and resident of Martinez, California, located in Contra Costa County.

7.     Defendant Volkswagen Group of America, Inc. is a New Jersey corporation with its headquarters and principal place of business in Herndon, Virginia.

8.     Defendant Volkswagen AG is a German corporation and the parent company of Volkswagen Group of America, Inc.  Its headquarters and principal place of business are in Wolfsburg, Germany.  The two defendants are referred to collectively in this complaint as "Volkswagen."

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action which Defendants Volkswagen AG and Volkswagen Group of America, Inc. are citizens of different jurisdictions from members of the proposed class, including Plaintiffs Lau and Herman.

10.     This Court may exercise jurisdiction over Volkswagen because Volkswagen is registered to conduct business in California; has sufficient minimum contacts in California; and intentionally avails itself of the markets within California through the promotion, sale, marketing, and distribution of its vehicles, thus rendering the exercise of jurisdiction by this Court proper and necessary.

11.     Venue is proper in this District under 28 U.S.C. § 1391 because Volkswagen resides in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

CLASS ACTION COMPLAINT

1

**INTRADISTRICT ASSIGNMENT**

2    12.    Assignment is proper to the San Jose division of this District under Local Rule 3-2(c)-

3 (e), as a substantial part of the events or omissions which give rise to the claim occurred in Santa Clara

4 County.

5

**SUBSTANTIVE ALLEGATIONS**

6

Volkswagen

7    13.    Volkswagen designs, manufactures, markets, distributes, and warrants vehicles in the

8 United States under the Volkswagen and Audi brand names.  Volkswagen recently surpassed Toyota,

9 becoming the world's largest automaker, with diesel engine vehicles accounting for over 20 percent of

10 its sales.

11    14.    This case involves approximately 500,000 model year 2009-2015 Volkswagen and Audi

12 brand vehicles.  All are equipped with a 2.0L diesel engine.

13

Clean Diesel

14    15.    Diesel engines first became common in American passenger vehicles in the 1970s and

15 1980s, but gained a reputation as "dirty" because they emitted noxious gases and particulate matter.  As

16 diesel engines need to be more robust than comparable gasoline engines, diesel-powered vehicles also

17 cost more to produce and commanded a premium price.  These factors, combined with increasingly

18 stringent emissions regulations caused diesel passenger vehicles to become increasingly unpopular in

19 the American market.

20    16.    In the mid-2000s, California and several other states passed new emission standards

21 strictly regulating exhaust emissions, including oxides of nitrogen (NOx).  This effectively banned the

22 sale of diesel passenger vehicles in these states because the nature of diesel engines inherently makes

23 NOx emissions a particularly difficult problem to resolve.  Facing the implementation of similarly

24 stringent federal regulations, Volkswagen and several other manufacturers launched the joint BlueTec

25 Diesel Initiative to research and develop "exhaust emission treatment systems which meet even the

26 strictest emission regulations in the US market."

27    17.    By the late 2000s, Volkswagen claimed to have improved diesel technology and

28 developed an environmentally-friendly diesel engine that could meet modern emissions standards.

3

Volkswagen marketed these new vehicles as "Clean Diesel," arguing that its engines were much improved from the diesels of the 1970s and 1980s.  Taking advantage of then-rising fuel prices, and diesel engines' fuel-efficiency and high torque outputs, Volkswagen told consumers they could have it all—power, high fuel economy, and low emissions—if they paid a few thousand dollars more for its "clean" diesel vehicle.

18.     To overcome consumer perceptions of "dirty" diesel vehicles, Volkswagen embarked on a major marketing campaign emphasizing its vehicles' low emissions and environmental friendliness.  Volkswagen created various webpages, press releases, and television commercials dedicated to differentiating "Clean Diesel" from consumer perceptions of dirty diesel vehicles.  In August 2008, Volkswagen kicked off the campaign by announcing that it had developed the first diesel vehicle compliant in all fifty states under modern emission standards, its 2.0L TDI (Turbocharged Direct Injection) engine.  CEO Stefan Jacoby stated: "We're proud to be the first manufacturer to offer a clean diesel vehicle for sale in all fifty states" and argued that the clean diesel Jetta model "truly offer[s] a no compromise alternative fuel driving experience, that provides the customer the best of both worlds—excellent fuel efficiency combined with a dynamic driving experience."  Below is an image of the headline from Volkswagen's announcement:



19.     Following this announcement, the diesel Volkswagen Jetta TDI was awarded the 2009 Green Car of the Year by *Green Car Journal*.  Volkswagen began to promote it as the "Official Pace Car of the Environment" and again described its clean diesel vehicles as the "best of both worlds, an alternative fuel vehicle with no compromises."  Volkswagen's website specifically emphasized emissions compliance, describing how "[f]uel efficiency, performance and convenience come standard

with the 50-state compliant Jetta TDI sedan and Sportswagen models, which meet the most stringent emission standards in California."  Another Volkswagen promotion suggested that clean diesel vehicles were a "new alternative for shoppers craving efficiency, low emissions, and unrivaled value all in one attractive package."  Most of all, Volkswagen tried to distance itself from consumer perceptions of dirty diesel emissions, describing how "[t]hose old realities no longer apply."  Below are images from Volkswagen's webpage promoting the environmental friendliness of its clean diesel vehicles:







## With reduced emissions.

These are not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler. Clean diesel vehicles meet some of the strictest standards in the world. Plus, TDI technology helps reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.[1]

▶ Watch and learn about TDI® Clean Diesel

## This ain't your daddy's diesel.

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel.

- Engineered to burn low-sulfur diesel fuel
- "Common Rail" direct injection system

20.     In an effort to compete with the environmental advantages of hybrid vehicles, Volkswagen created a webpage titled *Clean Diesel v. Hybrid* where it compared the advantages and disadvantages of hybrids and clean diesels.  Volkswagen argues that its diesel emissions are as "clean" as hybrid emissions, describing how "the TDI engines in both the Jetta Sedan, Sportwagen and the Toureg SUV are certified to meet the same tough government emission standards—known as 'Tier 2 Bin 5'—as the cleanest gasoline-electric hybrids."

21.     To further emphasize the company's environmental focus, Volkswagen created an entire campaign devoted environmental sustainability called "Think Blue."  According to Volkswagen's Think Blue campaign, the company is dedicated to sustainable mobility and eco-friendly living, and its diesel vehicles are part of an environmentally friendly lifestyle.  The TDI webpage states that "TDI

represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors."  Think Blue is "about being more responsible on the road and more environmentally conscious."

22.     Other statements about clean diesel in Volkswagen marketing materials included how:

    a.     Clean diesel is "[f]or the eco-conscious and the high-performance-conscious;"

    b.     Clean diesel is "more efficient, eco-conscious, and fun to drive;"

    c.     Clean diesel technology "impacts fuel efficiency and performance, while being a more eco-conscious choice;"

    d.     Volkswagen's manufacturing "continues to refine and perfect the clean diesel technology we have pioneered, which delivers a dramatic reduction in both fuel consumption and exhaust emissions and offers some of the cleanest and most efficient alternatives on the market today."

Diesel Engine Emissions

23.     The diesel internal combustion engine differs from the typical gasoline powered engine in that it uses highly compressed hot air to ignite the fuel rather than using a spark plug.  As in a gasoline engine, the burning fuel rapidly expands, moving the piston, which transmits power to the crankshaft.

24.     The "Clean Diesel" vehicles that Volkswagen introduced in 2008 used a new-generation 2.0 Liter TDI with a common rail injection system.  The 2.0L TDI was based on the 1.9L TDI, one of the most frequently built diesel engines in the world and Volkswagen's most common engine outside the United States.  Volkswagen introduced the 2.0L TDI to accommodate increasing demand for improvements in sound, fuel consumption, and exhaust gas emissions.  The engine utilizes a special computer-controlled exhaust gas after-treatment system that Volkswagen claimed met federal and CARB emission standards when first introduced.

25.     Emissions have often been an obstacle for diesel vehicles.  While the use of cleaner fuels and new technologies has improved certain types of emissions problems, others remain.  As a result of their high combustion and compression pressures, diesel engines typically produce high levels of NOx in the combustion process.

7
CLASS ACTION COMPLAINT

Oxides of Nitrogen

26.     Oxides of nitrogen (or NOx) are a highly reactive group of gases that the EPA and other government agencies have found to create environmental problems and public health hazards, including smog, ground-level ozone, and acid rain.  For example, direct exposure to NOx can cause respiratory problems, such as lung irritation, bronchitis, or pneumonia.  When NOx combines with sunlight, it may create photochemical smog, which appears as a brownish ground-level haze and causes chest pains, shortness of breath, coughing and wheezing, and eye irritation.  NOx is one of the main ingredients involved in the formation of ground-level ozone.  Breathing ozone can also trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion and can worsen bronchitis, emphysema, and asthma.  Children are at the greatest risk of experiencing negative health impacts from exposure to ozone.  When mixed with rain in the atmosphere, NOx can create nitric acid or acid rain.  NOx is also a contributor to global warming.

Regulatory Framework

27.     Because of the serious hazards created by NOx emissions, both the EPA and CARB have regulated NOx.

28.     The federal Clean Air Act prohibits the sale of any vehicle in the United States that does not comply with emissions regulations set by the EPA.  42 U.S.C. § 7522.  The current regulations, Tier 2, were implemented by the EPA between 2004 and 2009, and apply to all light-duty vehicles regardless of the fuel that they use.  The Tier 2 regulations include certification levels of different levels of stringency, called certification bins.  Volkswagen chose to certify Class Vehicles to the Tier 2, Bin 5 standard, which has a maximum NOx level of .05 g/mi for a vehicle's intermediate life (5 years/50,000 miles) and .07 g/mi for a vehicle's full useful life (10 years/120,000 miles).  40 C.F.R. § 86.1811-04(c). In addition, a manufacturer's fleet average of NOx for any given model year must be under .07 g/mi. *Id.* at § 86.1811-04(d).

29.     On the state level, CARB adopted Low-Emissions Vehicle (LEV) II emission standards that generally became applicable in the 2004 model year.  *See* The California Low-Emission Vehicle Regulations, http://www.arb.ca.gov/msprog/levprog/cleandoc/cleancomplete%20lev-ghg%20regs%201-15.pdf (amended January 1, 2015); Cal. Code. Regs. Tit. 13 § 1961.  Under the LEV

8

CLASS ACTION COMPLAINT

1   II standard, NOx emissions were significantly tightened and required light-duty passenger vehicles

2   (including Class Vehicles) to emit no more than .05 g/mi initially, and no more than .07 g/mi over their

3   useful life.  Cal. Code. Regs. Tit. 13 § 1961.

4          30.     To comply with EPA and CARB regulations concerning NOx, vehicle manufactures use

5   a variety of exhaust treatment systems to control NOx emissions.  Exhaust gas recirculation (EGR)

6   systems reintroduce some exhaust gases into the engine's intake.  This lowers the peak temperature of

7   combustion, which reduces the chance of NOx forming.  Some vehicles use a lean NOx trap, a system

8   that relies on the power control module's ability to toggle the air-fuel ratio between rich and lean.  The

9   trap absorbs NOx from exhaust during lean air mixtures, and ultimately reduces it to nitrogen gas when

10  the air-fuel ratio is switched to a rich mixture and back to lean.  Newer diesel vehicles may utilize

11  selective catalytic reduction systems (SCR).  SCR is a process that uses ammonia or urea water

12  solutions in the exhaust stream to remove oxygen from NOx, forming water instead.  SCR systems only

13  work well within specific temperature ranges and when using specific proportions of chemicals.

14  Diagrams of a lean NOx trap (referred to as a Nitrogen Oxide Catalytic Converter) and an SCR system

15  appear below:

16

17

18

19

20

21

22

23

24

25

26

27

28



9



31.     Federal and California regulations require manufacturers to apply for certifications that their vehicles meet applicable emission standards.   40 C.F.R. § 86.1843-01.  The federal application must include a list of all auxiliary emission control devices installed on the vehicle.  *Id.* at § 86.1844-01(d)(11).  An auxiliary emission control device is defined as "any element of design which senses . . . any . . . parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system."  *Id.* at § 86.1803-01.  The federal application must also contain a detailed justification for each auxiliary emission control device that results in a reduction in the effectiveness of the emission control system, and a rationale for why it is not a "defeat device."  *Id.* at § 86.1844-01(d)(11).

32.     Defeat devices are expressly forbidden by federal regulations.  *See* EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat Device* (Dec. 11, 1972); *see also* 40 C.F.R. §§ 86-1809-01, 86-1809-10, 86-1809-12.  Stated simply, a defeat device is hardware or software that "defeats" the vehicle's emission controls during normal vehicle operation—enabling the vehicle to produce low emissions during emissions testing, but not during normal operation.  The Clean Air Act makes it a violation for any person to sell, manufacture, or install any component in a motor vehicle "where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle . . . in compliance with the regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use."  Clean Air Act, 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854012(a)(3)(ii).  Similarly, the EPA has specifically recognized that

CLASS ACTION COMPLAINT

1  electronic control systems that affect the emission control system's performance may be defeat devices.

2  EPA, *Advisory Circular Number 24-2: Prohibition on Emission Control Defeat Devices – Optional*

3  *Objective Criteria* (Dec. 6, 1978).

4      33.    Every vehicle sold in the U.S. must be covered by Certificate of Conformity from the

5  EPA.  40 C.F.R. § 86.1843-01.  However, vehicles are only covered by a Certificate of Conformity if

6  they are sold as described in the manufacturer's application for certification.  *Id.* at §86.1848-10(c)(6).

7  Similarly, auto manufacturers must be certified by CARB in order to sell vehicles in California.  Motor

8  vehicles equipped with defeat devices, which reduce the effectiveness of the emission control system

9  during normal driving conditions, cannot be certified.

10      34.    Both federal and California regulations mandate that manufactures include certain

11  emissions-related labels on the vehicles they sell.  First, the regulations require that an emissions label

12  titled "Vehicle Emission Control Information" be placed under the hood or in the engine compartment

13  and contain "an unconditional statement of compliance" with federal and California emissions

14  regulations.  40 C.F.R. § 86.1807-01; Cal. Code. Regs. Tit. 13 § 1965.  Auto manufacturers must affix

15  this label to every motor vehicle that they intend to sell to the public in the United States subject to the

16  applicable emissions standards.  Below is an exemplar Emission Control label from a non-diesel

17  Volkswagen vehicle:



27      35.    Beginning in the 1998 model year, a Smog Index label began appearing on all new cars

28  sold in California.  The label was intended to help consumers compare smog forming emissions from

different vehicles within that model year.  Cars manufactured after January 1, 2009, were also required to affix an Environmental Performance label.  These labels provided both a Smog Score and a Global Warming Score, ranging from 1 to 10, with 10 being the cleanest and 5 being the average vehicle.  An example of this label from a non-diesel vehicle is below:



WVU Emissions Study and Subsequent Government Investigation

36.     In May 2014, West Virginia University's Center for Alternative Fuels, Engines & Emissions published the results of a study commissioned by the International Council on Clean Transportation that found in-use emissions from two Volkswagen vehicles (a 2012 Jetta and a 2013 Passat) that were significantly higher than the Tier 2 Bin 5 NOx standard.  The Jetta exceeded the standard by 15 to 35 times and the Passat exceeded it by 5 to 20 times.   Below is a graph of the results from that study:

Figure 4.3: Average NOx emissions of test vehicles over the five test routes compared to US-EPA Tier2-Bin5 emissions standard; repeat test variation intervals are presented as ±1σ; Route 1 for Vehicle A includes rush-hour/non rush-hour driving, 'R' designates routes including a test with DPF regeneration event, 'nd' - no data available

CLASS ACTION COMPLAINT

37.     Following publication of the study, the EPA and CARB began to investigate the issue. Volkswagen responded that increased emissions could be the result of unexpected technical issues or conditions.  Volkswagen then issued a voluntary recall in December 2014, but testing performed by CARB and the EPA showed that there was only a limited benefit to the recall and that the vehicles still did not comply with EPA or CARB standards.

38.     CARB and the EPA told Volkswagen that they would not approve certificates of conformity for Volkswagen's 2016 model year diesel vehicles until it explained the results, leading Volkswagen finally to admit that it had been deceiving the government and consumers.  In a meeting with CARB and EPA staff on September 3, 2015, Volkswagen admitted that Class Vehicles were designed and manufactured with a defeat device in the form of a sophisticated software algorithm that detected when the vehicle was being tested for emissions standards based on inputs including the position of the steering wheel, vehicle speed, the duration of the engine's operation, and barometric pressure.  These inputs track the parameters of the federal and state procedures used for certification testing.  During EPA emission testing, the vehicles' electronic control modules ran a particular calibration called the "dyno calibration" (referring to the equipment used in emissions testing–the dynamometer) that produced compliant emissions results.  At all other times during normal vehicle operation, the vehicle software ran a separate "road calibration" that reduced the effectiveness of the lean NOx trap and SCR emission control systems.  As a result, emissions of NOx increased by a factor of 10 to 40 times above EPA compliant levels when driven by a consumer.

39.     On September 18, 2015, the EPA and CARB issued notices to Volkswagen directing CARB to immediately initiate discussions to rectify the emission non-compliance and noting that the EPA may seek up to $37,500 for each violation.

40.     Christopher Grundler, director of the EPA's Office of Transportation of Air Quality, said it is "incomprehensible" how the world's largest automaker could install "defeat devices" to evade emissions requirements.  The agency said the vehicles' software intentionally detects when the car is undergoing official emissions testing, "and turns full emissions controls on only during the test." When vehicles are being driven normally, the computer disables the emissions controls.

41.     In a statement on September 20, 2015, Volkswagen CEO Martin Winterkorn said the company was "deeply sorry that we have broken the trust of our customers and the public."  Regarding the allegations by the EPA, a spokesperson for Volkswagen stated: "We have admitted it to the regulator.  It is true.  We are actively cooperating with the regulator."  Volkswagen also announced that it was halting sales of all 2.0L TDI engine vehicles in the United States.

42.     Because disengaging pollution controls can yield better performance, implementing changes to the emissions system will impact vehicle performance and fuel economy.

### PLAINTIFFS' EXPERIENCES

43.     Plaintiff Warren Lau bought a new 2011 Volkswagen Golf with a 2.0L TDI Engine from Capitol Volkswagen in San Jose, California in September 2011.

44.     Plaintiff Elaine Herman bought a new 2011 Volkswagen Jetta with a 2.0L TDI engine from Dirito Brothers Volkswagen in Walnut Creek, California in September 2011.

45.     Plaintiffs purchased their vehicles in part, because they believed they were fuel efficient and good for the environment.  Before purchasing their vehicles, Plaintiff reviewed their product labels and supporting documentation.  These materials did not disclose that the vehicles did not comply with applicable emissions regulations or that Volkswagen had installed a defeat device in their vehicles.  They chose to purchase their vehicles instead of competing products, in part, based on these representations.  Thus, Plaintiffs reasonably believed at the point of sale that their vehicles complied with applicable emissions standards and did not contain a defeat device.

46.     Had Plaintiffs known that their vehicles did not comply with applicable federal or California emission standards, they would not have purchased their vehicles or would have paid less for them.

### CLASS ACTION ALLEGATIONS

47.     "Class Vehicles" includes the 2.0L diesel versions of the following vehicles:

a.      2009-2015 Volkswagen Jetta (including the Jetta Sportswagen);

b.      2010-2015 Volkswagen Golf (including the Golf Sportswagen);

c.      2010-2015 Audi A3;

d.      2012-2015 Volkswagen Beetle (including the Beetle Convertible); and

CLASS ACTION COMPLAINT

e.      2012-2015 Volkswagen Passat.

48.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed classes of persons, initially defined as:

**Nationwide Class:**

All persons who bought or leased a Class Vehicle in the United States.

**California Class:**

All persons who bought or leased a Class Vehicle in California.

49.      Excluded from the proposed class is Volkswagen; any affiliate, parent, or subsidiary of Volkswagen; any entity in which Volkswagen has a controlling interest; any officer, director, or employee of Volkswagen; any successor or assign of Volkswagen; and any judge to whom this case is assigned and any member of his or her immediate family.

50.      Numerosity.  Volkswagen has sold hundreds of thousands of Class Vehicles, such that there are far too many class members to be practically joined in a single action.

51.      Existence and predominance of common questions.  Common questions of law and fact exist as to all members of the proposed class and predominate over questions affecting only individual class members.  These common questions include:

a.      Whether Volkswagen installed a defeat device in Class Vehicles;

b.      Whether Class Vehicles fail to comply with the applicable federal and state emissions regulations as a result of the defeat device;

c.      Whether Volkswagen had a duty to disclose the existence of the defeat device and its consequences to its customers;

d.      Whether Volkswagen's marketing of Class Vehicles was likely to deceive or mislead consumers;

e.      Whether the existence of the defeat device and its consequences would be considered material by an objectively reasonable person;

f.      Whether Volkswagen's conduct violates any applicable warranties; and

g.      Whether Plaintiffs were injured as a result of Volkswagen's conduct.

CLASS ACTION COMPLAINT

52.     Typicality.  Plaintiffs' claims are typical of the claims of the proposed classes.  Plaintiffs and the class members they propose to represent purchased or leased Class Vehicles that contain the same defeat device, giving rise to substantially the same claims.

53.     Adequacy.  Plaintiffs are adequate representatives of the proposed classes because their interests do not conflict with the interests of the class members they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and intend to prosecute this action vigorously.

54.     Superiority.  The action may be certified under Rule 23(b)(3) because common questions predominate as described above and because a class action is the best available method for the fair and efficient adjudication of this controversy.  This litigation involves technical issues that will require expert testimony and targeted discovery of sophisticated defendants, and could not practically be taken on by individual litigants.  In addition, individual litigation of class members' claims would be impracticable and unduly burdensome to the court system and has the potential to lead to inconsistent results.  A class action presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

55.     In the alternative to class certification under Rule 23(b)(3), the proposed classes may be certified under Rule 23(b)(2) because Volkswagen has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory appropriate with respect to the class as a whole.

## COUNT ONE

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. §§ 2301 et seq.)

### (On Behalf of the Nationwide Class)

56.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

57.     Plaintiffs bring this class on behalf of themselves and a Nationwide Class, as defined above, against Defendants.

58.     The Class Vehicles are "consumer products" under 15 U.S.C. § 2301(1).

59.     Plaintiffs and the members of the putative Class are "consumers" under 15 U.S.C. § 2301(3).

60.     Defendants are "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

61.     Defendants provided purchasers and lessees of Class Vehicles multiple written warranties as defined by 15 U.S.C. § 2301(6).

62.     ***Manufacturer's Warranty***.  Defendants provided Plaintiffs and each member of the Nationwide Class who purchased a new Class Vehicle with a Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or 36,000 miles, whichever comes first. This warranty covers emissions related repairs.  This warranty is directly applicable to the Class Vehicles.

63.     As required by law, Defendants also provided a Federal Emissions Warranty to members of the Nationwide Class and a California Emissions Warranty to members of the California Class.  Vehicles certified to meet California emissions standards and registered in states which have adopted those standards are also entitled to coverage under the California Emissions Warranty.

64.     ***Federal Emissions Warranty***.  Consistent with federal law, Defendants provided Plaintiffs and the proposed nationwide class with a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover all emissions related parts for 2 years or 24,000 miles (whichever comes first), with the catalytic converter, engine control unit, and onboard diagnostic device covered for 8 years or 80,000 miles (whichever comes first). These warranties are directly applicable to the Class Vehicles.

65.     ***California Emissions Warranty***.  California law requires additional warranty coverage beyond that required by federal law. Under California law, all emissions related performance and parts are covered for 3 years or 50,000 miles (whichever comes first), and a vehicle-specific list of more expensive emissions related parts is covered for 7 years or 70,000 miles (whichever comes first). In addition, the 8 year or 80,000 mile coverage for the catalytic converter, engine control unit, and onboard diagnostic device required by Federal law also applies. 13 Cal. Code. Regs. § 2038; *see* Cal.

Health & Safety Code § 43205. The California Emissions Warranty provisions described here cover vehicles up to 14,000 pounds GVWR, and are directly applicable to the Class Vehicles.

66.     Defendants breached these warranties by selling the Class Vehicles with a defeat device which renders the emissions control systems defective, and the Class Vehicles thus do not comply with emissions standards set by federal law. This device cannot be repaired or redressed without materially altering the advertised estimated fuel economy and other performance characteristics of the vehicle.

67.     Volkswagen's breach of warranty has deprived Plaintiffs and other Class members of the benefit of their bargain.  The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

68.     Defendants had an opportunity to disclose information concerning the Class Vehicle's inability to perform as warranted, and to cure its breach of warranties, at least since May 2014, in response to the West Virginia study and in response to inquiries by the EPA and CARB. And yet Defendants have failed to do so. Contemporaneously with the filing of this complaint, Plaintiff is making further demand of Defendants—in writing and on behalf of the proposed class—to comply with its warranty obligations and is offering to participate in an informal dispute settlement procedure.

69.     As a direct and proximate result of Defendants's conduct, Plaintiffs and other members of the Nationwide Class have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered. Plaintiffs and members of the Nationwide Class are entitled to legal and equitable relief against Defendants, including damages, specific performance, attorney fees, costs, and other relief as appropriate.

## COUNT TWO

### FRAUD BY CONCEALMENT

**(On Behalf of the Nationwide Class)**

70.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

71.     Plaintiffs bring this class on behalf of themselves and a proposed Nationwide Class, as defined above, against Defendants.

72.     Since at least 2009, Defendants have intentionally concealed and suppressed the material fact that they had installed an illegal "defeat device" in the Class Vehicles to either bypass or render inoperative elements of the vehicle design related to compliance with federal and California emission standards, and that its vehicles emit as much as 40 times the amount of pollution allowed under federal and California law. In addition, Defendants intentionally concealed and suppressed the material fact that the vehicles, if brought in compliance with federal and California emissions standards, would exhibit diminished performance and fuel economy, as compared to the performance and fuel economy promised by Defendants through their advertising and marketing.

73.     Defendants had a duty to disclose these facts because they had exclusive knowledge of the material facts described above and such facts were not known or reasonably knowable by the Plaintiff and proposed class; because it actively concealed these material facts from the Plaintiff and the proposed class; and because it made partial representations regarding the Class Vehicle's emissions and the vehicles compliance with federal and state law, while at the same time suppressing material facts regarding the vehicle's emission of the pollutant nitrogen oxide.

74.     These facts which Defendants concealed were material because they suggested, falsely, that these vehicles are compliant with federal and state emissions requirements. In addition, these facts were material because whether the Class Vehicles are so compliant, and whether they are "clean" diesel vehicles, directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the proposed nationwide class.

75.     Defendants actively concealed or suppressed these material facts at least since 2009, in order to profit from the sale of these vehicles and to defraud Plaintiffs and consumers.

76.     Plaintiffs and the proposed nationwide class had no knowledge of, and had no reason to know, that Defendants had concealed or suppressed these material facts. In fact, such facts were exclusively known by Defendants. Plaintiffs and the proposed nationwide class would not have purchased the Class Vehicles, or would have paid substantially less for them, had Defendants not concealed or suppressed these material facts.

77.     As a result of Defendants' fraudulent concealment, Plaintiffs and the proposed nationwide class's vehicles have lost significant value. Plaintiffs and the proposed class are thus entitled to damages in an amount to be determined at trial.

78.     Because Defendants' conduct was wanton, deliberate, oppressive and malicious, or in reckless disregard of Plaintiffs' and the proposed nationwide class' consumer and contractual rights, Plaintiffs and the proposed nationwide class are entitled to an award of punitive or exemplary damages in an amount to be determined at trial.

## COUNT THREE

### VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### (CAL. BUS. & PROF. CODE § 17200)
### (On Behalf of the California Class)

79.     Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

80.     Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Class against Defendants.

81.     Defendants' acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, Cal. Bus. & Prof`. Code §§ 17200 *et seq*.

82.     Defendants' acts and practices constitute unlawful business practices, as discussed elsewhere in this Complaint, in that they violate section 203(a)(3)(B) of the Clean Air Act (CAA), 42 U.S.C. § 7522(a)(3)(B) and its implementing regulations; section 203(a)(l ) of the CAA, 42 U.S .C. § 7522(a)( l ) and its implementing regulations; the federal Magnuson-Moss Warranty Act; California's Consumers Legal Remedies Act; California's Song-Beverly Consumer Warranty Act; California law governing vehicle emissions; and breach Volkswagen's warranties.

83.     Defendants' acts and practices constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Defendants' conduct is outweighed by the harm to consumers; (iii) the injury is not one that consumers reasonably could have avoided; and/or (iv) the conduct runs afoul of the policies underlying the federal Clean Air

Act, its implementing regulations, and California emissions standards, which seek to minimize harmful emissions and provide consumers with accurate information about the pollutant levels emitted by vehicles placed in the stream of commerce.

84.    Defendants' acts and practices constitute fraudulent practices in that they are likely to deceive a reasonable consumer, who would not have purchased a Class Vehicle, or would have paid substantially less for a Class Vehicle, had Volkswagen had adequately disclosed that the Class Vehicles failed to comply with federal and California emissions standards.

85.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and the proposed California Class have suffered injury in fact and lost money or property, in that they bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. In addition, Plaintiffs and the proposed class will incur additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are altered in order to bring them into compliance with federal and state emissions standards. Meanwhile, Defendants have sold or leased more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

86.    Plaintiffs and the proposed California Class are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to Defendants because of their unfair and deceptive practices and such other orders as may be necessary to prevent the future use of these practices.

**COUNT FOUR**

**VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW**

**(CAL. BUS. & PROF. CODE §§ 17500, et seq.)**

**(On Behalf of the California Class)**

87.    Plaintiffs and the California Class incorporate by reference all allegations of the preceding and succeeding paragraphs as though fully set forth herein.

88.    Plaintiffs bring this claim on behalf of themselves and on behalf of the members of the California Class against Defendants.

89.     California's False Advertising Law prohibits any "unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500. This prohibition extends to advertising which is false, and also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.

90.     Through advertising, marketing, and other publications described at length above, Defendants disseminated, or caused to be disseminated, in California and nationally, statements regarding the Class Vehicles which were false or misleading, including that these vehicles are "Clean Diesel" vehicles when, in fact, they did not meet federal or California emissions standards.

91.     Defendants' misrepresentations and omissions regarding the Class Vehicle's emissions compliance, its performance, and its fuel efficiency were material and likely to deceive reasonable consumers such as Plaintiffs and the California Class.

92.     Volkswagen knew or should have known these statements were false and misleading and would deceive consumers, including Plaintiffs and the California Class.

93.     Plaintiffs and the California Class have suffered injury-in-fact, including the loss of money and property, as a result of Defendants' misrepresentations and omissions, which are unfair, deceptive, untrue, or misleading in violation of the False Advertising Law. Plaintiff and the California Class would not have purchased or leased the Class Vehicles had they known of the deceptive nature of Defendants' misrepresentations and omissions, or they would have paid less for the Class Vehicles. Also, Plaintiffs and the proposed class will incur additional fuel costs, and a diminution in the performance of their respective Class Vehicles, if and when their Class Vehicles are altered in order to bring them into compliance with federal and state emissions standards.

94.     Plaintiffs and the proposed California Class are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to Defendants because of their deceptive practices and an order requiring Volkswagen to adequately disclose and repair the defect.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT FIVE**

**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT**

**(CAL. CIV. CODE § 1750, et seq.)**

**(On Behalf of the California Class)**

95.     Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

96.     Defendants violated the Consumers Legal Remedies Act (CLRA), California Civil Code §§ 1770(a)(2), (3), (5), (7), (9), and (16), by engaging in unfair methods of competition and unfair and deceptive acts and practices in connection with transactions—namely, the sale of Class Vehicles to Plaintiffs and the proposed California Class—that were intended to, and did, result in the sale and lease of goods to consumers.  In connection with the sale or lease of Class Vehicles to Plaintiffs and California Class members, Defendants concealed and failed to disclose that Class Vehicles do not meet federal and state emissions standards and that they achieve their performance and fuel efficiency as a result of an illegal defeat device.  These facts are material to a reasonable consumer in that they negatively affect Class Vehicles' environmental emissions and market value.   If and when the Class Vehicles are altered to bring them into compliance with federal and state emissions standards, Plaintiffs and the proposed class will incur additional fuel costs, and a diminution in the performance of their respective Class Vehicles. Defendants had a duty to disclose these facts to consumers because they had exclusive knowledge of those facts, which were not known or reasonably knowable by the Plaintiff and proposed class; because it actively concealed these material facts from the Plaintiff and the proposed class; and because it made partial representations regarding the Class Vehicle's emissions and the vehicles compliance with federal and state emissions law, while at the same time suppressing material facts regarding the vehicle's emissions.

97.     As a direct and proximate result of Defendants' conduct, Plaintiffs and California Class members have been harmed. Plaintiffs and the other California Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Meanwhile, Defendants have sold

1  more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles,

2  thereby unjustly enriching themselves.

3       98.    Plaintiffs and the proposed Class are entitled to equitable relief and a declaration that

4  Defendant's conduct violates the Consumer Legal Remedies Act.

5       99.    Plaintiffs disclaim any request for monetary relief, including punitive damages, under

6  the Consumer Legal Remedies Act at this time but reserve the right to seek such relief after providing

7  Defendants with the notice required by the Act.

8  <u>**COUNT SIX**</u>

9  **VIOLATION OF THE SONG-BEVERLY CONSUMER WARRANTY ACT**

10  **BREACH OF IMPLIED WARRANTY**

11  **(CAL. CIV. CODE §§ 1791, et seq.)**

12  **(On Behalf of the California Class)**

13       100.    Plaintiffs and the California Class incorporate by reference each preceding and

14  succeeding paragraph as though fully set forth at length herein.

15       101.    Plaintiffs bring this claim on behalf of themselves and the California Class.

16       102.    Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

17       103.    Volkswagen is a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

18       104.    Volkswagen impliedly warranted to Plaintiffs and the California Class that Class

19  Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792.

20       105.    Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied

21  warranty that goods are merchantable" means that the consumer goods meet each of the following:

22       (1)    Pass without objection in the trade under the contract description.

23       (2)    Are fit for the ordinary purposes for which such goods are used.

24       (3)    Are adequately contained, packaged, and labeled.

25       (4)    Conform to the promises or affirmations of fact made on the container or label.

26       106.    Class Vehicles would not pass without objection in the automotive trade because the

27  Class Vehicles do not conform in material respects with federal and California emissions standards,

28

CLASS ACTION COMPLAINT

1    were sold with an illegal defeat device, as described above, and emit pollutants such as NOx by a factor

2    of 10 to 40 times above the EPA compliant levels.

3        107.    As described above, the Class Vehicles are not fit for ordinary purposes for which such

4    goods are used.

5        108.    Class Vehicles are not adequately labeled because the labeling misrepresents that the

6    vehicles are compliant with federal and California emissions standards or fails to disclose such non-

7    compliance.

8        109.    Volkswagen's conduct deprived Plaintiffs and the proposed California Class of the

9    benefit of their bargain and have caused Class Vehicles to be worth less than what Plaintiffs and other

10   proposed California Class members paid.

11       110.    As a direct and proximate result of Volkswagen's breach of its duties, proposed

12   California Class members received goods whose condition substantially impairs their value. Plaintiffs

13   and the proposed California Class have been damaged by the diminished value of the vehicles, the

14   vehicles' malfunctioning, and actual and potential increased maintenance and repair costs.

15       111.    Plaintiffs and Class members have complied with all obligations under the warranty, or

16   otherwise have been excused from performance of said obligations as a result of Defendants' conduct

17   described herein.

18       112.    Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and proposed California Class

19   members are entitled to damages and other legal and equitable relief including, at their election, the

20   purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class

21   Vehicles, and are also entitled to their attorney fees and costs.

22   <strong><u>TOLLING</u></strong>

23       113.    Any applicable statute of limitations that might otherwise bar any class member's claims

24   is tolled by Volkswagen's knowing and active concealment of the defeat devices Class Vehicles.

25   Volkswagen kept Plaintiff and the members of the class ignorant of vital information essential to the

26   pursuit of their claims.  Class members could not reasonably have discovered that their vehicles

27   contained defeat devices prior to the EPA's Notice of Violation on September 18, 2015.

28

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

a.   For an order certifying the proposed classes and Plaintiffs' counsel to represent the classes;

b.   For an order requiring Volkswagen to buy back Class Vehicles or otherwise, free of charge, remove the defeat devices from Class Vehicles, ensure that Class Vehicles comply with applicable emission standards, and otherwise ensure that Class Vehicles conform to promised performance and fuel economy guarantees;

c.   For an order awarding Plaintiffs and class members actual, statutory, punitive or any other form of damages provided by statute, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

d.   For an order awarding Plaintiffs and class members restitution, disgorgement or other equitable relief provided by statute or as the Court deems proper, except that no monetary relief is presently sought for violations of the Consumers Legal Remedies Act;

e.   For an order awarding Plaintiffs and the members of the classes pre-judgment and post-judgment interest;

f.   For an order awarding Plaintiffs and the members of the classes reasonable attorney fees and costs of suit, including expert witness fees; and

g.   For an order awarding such other and further relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury for all issues so triable under the law.

CLASS ACTION COMPLAINT

Dated: September 21, 2015                    Respectfully submitted,

                                             **GIRARD GIBBS LLP**

                                             By:  __/s/ Eric H. Gibbs_____
                                                     Eric H. Gibbs


                                             Eric H. Gibbs
                                             Andre M. Mura
                                             Scott M. Grzenczyk
                                             Steve Lopez
                                             One Kaiser Plaza, Suite 1125
                                             Oakland, California 94612
                                             Telephone:     (510) 350-9700
                                             Facsimile:     (510) 350-9701
                                             ehg@girardgibbs.com
                                             amm@girardgibbs.com
                                             smg@girardgibbs.com
                                             sal@girardgibbs.com

                                             Elizabeth C. Pritzker
                                             Jonathan K. Levine
                                             Shiho Yamamoto
                                             **PRITZKER LEVINE LLP**
                                             180 Grand Avenue, Suite 1390
                                             Oakland, California 94612
                                             Telephone:     (415) 692-0772
                                             Facsimile:     (415) 366-6110
                                             ecp@pritzkerlevine.com
                                             jkl@pritzkerlevine.com
                                             sy@pritzkerlevine.com

                                             *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT